## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## AT PIKEVILLE

| | | |
|---|---|---|
| FREDDIE BREWER,<br>on Behalf of Himself and All<br>Others Similarly Situated, | ) ) ) | |
| | ) | |
| *Plaintiff*, | ) ) ) | **PROPOSED COLLECTIVE ACTION**<br>**UNDER FLSA AND CLASS ACTION**<br>**UNDER KWHA** |
| | ) ) | CASE NO.  _____ |
| v. | ) ) | |
| ALLIANCE COAL, LLC,<br>ALLIANCE RESOURCE PARTNERS,<br>L.P., ALLIANCE RESOURCES<br>OPERATING PARTNERS, L.P.,<br>ALLIANCE RESOURCE MANAGEMENT<br>GP, LLC,<br>EXCEL MINING, LLC, and<br>MC MINING, LLC, | ) ) ) ) ) ) ) ) ) | **JURY DEMANDED** |
| *Defendants*. | ) ) ) | |

## COMPLAINT

Plaintiff Freddie Brewer, on behalf of himself and all others similarly-situated, brings this Complaint as a collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and a class action pursuant to Fed. R. Civ. P. 23 under the Kentucky Wages and Hours Act ("KWHA"), against Defendants Alliance Coal, LLC, Alliance Resource Operating Partners, L.P., Alliance Resource Partners, L.P., Alliance Resource Management Group, LLC, Excel Mining, LLC, and MC Mining, LLC, states as follows:

### Summary of the Action

1.      Defendants Alliance Coal, LLC ("Alliance"), Alliance Resource Operating Partners, L.P, ("AROP"), Alliance Resource Partners, L.P. ("ARLP") and Alliance Resource

Management Group, LLC ("ARMG") (ARLP, AROP, ARMG and Alliance are together the "Parent Defendants") are the parent entities that own and control each of the subsidiary[1] Defendants Excel Mining, LLC ("Excel"), and MC Mining, LLC ("MC Mining") (Excel and MC Mining are together the "Subsidiary Defendants").

2.      Excel, during the past five years, has employed miners to work in the MC Mining Complex, located near Pikeville in Pike County, Kentucky, which is an underground coal mine that utilizes continuous mining units employing room-and-pillar mining techniques to produce low-sulfur coal.

3.      Defendants systematically and willfully failed to comply with the requirements of the FLSA and KWHA in at least three ways.

4.      First, Defendants required Plaintiff and similarly-situated workers to report to work before their scheduled shift, but only paid the workers for time worked after the scheduled beginning of the shift. Defendants illegally failed to pay for "off-the-clock" work performed prior to the scheduled beginning of the shift. An example of this policy, reduced to writing for the employees of Warrior Coal, LLC, a sister entity, is attached as Exhibit A (stating **"[y]ou must be dressed and ready 15 minutes prior to your shift."**) (emphasis in original).

5.      Second, Defendants stopped paying Plaintiff and similarly-situated workers at the time they came above-ground although the workers were required to perform additional work aboveground at the end of the shift, including taking off or "doffing" protective equipment and

---

[1]  According to ARLP's annual report on form 10-K, which was filed with the U.S. Securities and Exchange Commission ("SEC") on February 20, 2020, Defendant ARLP owns 98.9899% of the interest in Defendant AROP, which in turns owns 99.999% of the interest in Defendant Alliance, which in turn owns 100% of the interest in Defendants Excel, and MC Mining.

placing lights on chargers so that they would be charged for use the next shift, thereby depriving the workers of pay for this off-the-clock work at the end of each shift.

6.      Third, Defendants systematically and willfully failed to pay Plaintiff and Class Members the correct overtime rate of pay: instead of including an hourly amount on account of promised bonus compensation with each employee's hourly rate of pay as required by law before multiplying by 1.5 to arrive at the employee's overtime rate of pay, Defendants illegally pretended as if the employees did not receive that bonus compensation in calculating the overtime rate of pay.

7.      Defendants' illegal pay practices were systematically applied to workers at the Excel Mine / MC Mining Complex, in violation of the FLSA and Kentucky law, including the KWHA. Defendants should pay the wages illegally withheld from their employees plus statutory liquidated damages.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims of Plaintiff and those similarly situated pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

9.      This Court has and should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under the KWHA because they are so related to Plaintiff's claims under the FLSA that they form part of the same case or controversy and arise from the same set of operative facts as Plaintiff's claims under the FLSA.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business within the District and employed Plaintiff and the other employees who worked at the Mines within the District of this Court and, specifically, in the MC Mining Complex, located in Pike County, Kentucky.

## PARTIES

11.     Plaintiff Freddie Brewer is a resident of Pike County, Kentucky. During both the three (3) year and the five (5) year periods prior to the filing of this Complaint, he was employed by Defendants as a coal miner in Defendants' Excel Mine / MC Mining Complex. Pursuant to 29 U.S.C. § 216(b), Plaintiff Brewer has consented in writing to serving as a Plaintiff in this action. *See* Exhibit B.

12.     At all times relevant to this action, Plaintiff was nominally employed by Excel and he was also jointly employed by MC Mining and each of the Parent Defendants identified below.

13.     Defendant Alliance Coal, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its principal place of business being located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886. Upon information and belief, Defendant Alliance Coal, LLC's registered agent for service of process in the Commonwealth of Kentucky is Cogency Global, Inc. 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

14.     Defendant Alliance Resource Partners, L.P. is a for-profit limited partnership organized under the laws of the state of Delaware, with its principal place of business being located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886. Upon information and belief, Defendant Alliance Coal, LLC's registered agent for service of process in the Commonwealth of Kentucky is Cogency Global, Inc. 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

15.     Defendant Alliance Resource Operating Partners, L.P. is, upon information and belief, a full profit limited partnership organized under the laws of the state of Delaware, with its principal place of business being located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886. Upon information and belief, Defendant Alliance Resource Operating Partners, L.P.'s

4

registered agent for service of process is Cogency Global, Inc., 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

16.     Defendant Alliance Resource Management Group, LLC is, upon information and belief, a limited liability company organized under the laws of the state of Delaware, with its principal place of business being located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886. Upon information and belief, Defendant Alliance Resource Operating Partners, L.P.'s registered agent for service of process is Cogency Global, Inc., 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

17.     Defendant Excel Mining, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its principal place of business being located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886. Upon information and belief, Defendant Excel Mining, LLC's registered agent for service of process in the Commonwealth of Kentucky is Cogency Global, Inc., at 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

18.     Upon information and belief, Excel is a wholly-owned subsidiary of Alliance Coal, LLC (which is in turn a subsidiary of the other Parent Defendants) and its employment policies and procedures, described below, are uniformly established and directed by the Parent Defendants.

19.     Defendant MC Mining, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its principal place of business being 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886. Upon information and belief, Defendant MC Mining, LLC's registered agent for service of process in the Commonwealth of Kentucky is Cogency Global, Inc., at 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

20.     Upon information and belief, MC Mining is a wholly-owned subsidiary of Alliance Coal, LLC (which is in turn a subsidiary of the other Parent Defendants), and its employment

policies and procedures, described below, are uniformly established and directed by the Parent Defendants.

21.     Upon information and belief, each Parent Defendant exerted and exerts supervisory control over all employees (including Plaintiff) of Excel and MC Mining, and was and is involved in the daily operations of the business of the Excel Mine / MC Mining Complex as it pertains to the policies, processes and procedures for the compensation of all such employees, as described in more detail below.

22.     In the five years preceding the filing of this Complaint (and also in the three years preceding this Complaint), Defendants have employed in the Excel Mine / MC Mining Complex in non-exempt positions Plaintiff and numerous other similarly-situated current and former employees. As used herein, the term "non-exempt" refers to employees who work in positions that are not exempt from the protections of the FLSA and the KWHA, and therefore, are entitled to be paid overtime compensation for work performed in excess of forty (40) hours per week.

23.     Each Defendants' annual sales have, at all relevant times to this Complaint, exceeded $500,000.00. Indeed, Defendants have routinely reported substantially greater annual sales. For instance, in its Annual Report on Form 10-K, ARLP has reported revenue from coal sales of $1.7 billion in 2019, $1.8 billion in 2018, and $1.7 billion in 2017.  ARLP's website reports 2019 coal production for the MC Mining Complex of 1.0 million tons in 2019, which would equate to approximately $43.7 million at the 2018 average rate of $43.75 per ton of coal.[2] (*See*: http://www.arlp.com/appalachia/Index?KeyGenPage=330312).

---

[2] This is the rate per ton of coal which is published by the United States Energy Information Administration. *See* Average Sales Price of Coal by State and Coal Rank, 2018, (available at https://www.eia.gov/coal/annual/pdf/table31.pdf) (last visited Mar. 18, 2020).

24.     Each Defendant is an enterprise engaged in commerce or in the production of goods for commerce, as defined in 29 U.S.C. § 203.

## CLASS DEFINITIONS

25.     Plaintiff brings Count I of this lawsuit pursuant to FLSA, 29 U.S.C. § 216(b) as a collective action, individually, and on behalf of himself and the following class:

> All current and former employees of Excel Mining, LLC and/or MC Mining, LLC who were not fully-paid since March 21, 2017 for all overtime compensation due for such employee's work in one or more workweeks because the employer did not pay the employee (1) for time worked (or for reporting to work as requested by the employer to be available to work) prior to scheduled shifts, (2) for work performed at the end of the shift but after the employer stopped paying the employee or (3) overtime compensation due on account of bonus compensation (the "FLSA Collective").

26.     Plaintiff brings Counts II of this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, individually, and on behalf of himself and the following class:

> All current and former employees of Excel Mining, LLC and/or MC Mining, LLC who were not fully-paid since March 21, 2015 for all overtime compensation due for such employee's work in Kentucky in one or more workweeks because the employer did not pay the employee (1) for time worked (or for reporting to work as requested by the employer to be available to work) prior to scheduled shifts, (2) for work performed at the end of the shift but after the employer stopped paying the employee or (3) overtime compensation due on account of bonus compensation (the "Kentucky Class").

27.     The FLSA Collective and the Kentucky Class are together referred to as the "Classes."

28.     Plaintiff reserves the right to redefine the Classes prior to notice, and thereafter, as necessary.

## FACTUAL ALLEGATIONS

### Defendants Require "Off-The-Clock" Work Prior To Scheduled Shifts

29.     Plaintiff was regularly scheduled to work shifts at the Excel Mine and he was directed by Defendants to arrive at the workplace early enough to don protective gear and to be

7

"dressed and ready" at least fifteen minutes prior to the beginning of his scheduled shift. Plaintiff observed other Class Members had similar shifts and directions.

30.     However, Defendants never paid Plaintiff for the time between when he was required to arrive prior to his scheduled shift so that he could "dress out" and be "dressed and ready" fifteen minutes before the beginning of his scheduled shift; Defendants would only begin paying Plaintiff for work at the scheduled beginning of his shift. Plaintiff observed other Class Members were similarly paid.

31.     Because Defendants required Plaintiff  and Class Members to be present at their facility for Defendants' convenience to be ready to work at Defendants' request, Plaintiff and Class Members were "engaged to wait" during those fifteen minutes, and therefore, he should have been compensated for working those fifteen minutes even if Plaintiff and Class Members did nothing else during that time.

32.     However, during the time that Plaintiff and Class Members required to be present at the mine prior to the scheduled beginning of their shift, Plaintiff and Class Members performed a variety of activities that constituted compensable work, including the following:

(a)     Retrieving specialized protective gear and clothing from lockers;

(b)     Donning specialized protective equipment and clothing issued by the Defendants and required for the dangerous environment of an underground coal mine, including coveralls, boots, helmet, lamp, reflective gear, work belt, self-rescuer, text-pager tracking device, hearing protection, safety glasses, respirator, and gloves;

(c)     Gathering tools to be used during scheduled shift; and

(d)     Gathering materials to be used during scheduled shift.

33.     In addition, at the end of each shift, Plaintiff and Class Members were required to perform the time-consuming task of doffing their specialized protective equipment, returning their gear to their lockers, and placing lights on chargers so that the light battery could be recharged for use on future shifts. However, Defendants stopped paying Plaintiff and Class Members at the Excel and MC Mine at the time they came above-ground and did not pay them for doffing their specialized protective equipment.

34.     Because Defendants' required employees to be "dressed out" at least fifteen minutes before the beginning of their scheduled shifts, donning specialized protective equipment was itself work that required several minutes and it needed to be performed at Defendants' facilities because employees were prohibited from taking such protective equipment and clothing home. Thus, the time spent donning and doffing protective gear was in addition to the fifteen minutes prior to the beginning of a scheduled shift when other work would need to be performed.

35.     At all times, Defendants were aware that they were required to pay employees for the time spent dressing out, as well as for the fifteen minutes prior to the scheduled beginning of the shift, and from the first moment each employee clocked-in and "dropped" into the mine, but failed to do so.

36.     At all times, Defendants were also aware that they were required to pay employees for the time spent doffing their protective equipment at the end of the shift, but failed to do so.

37.     At all times, Defendants were aware that employees were reporting to work so as to be "dressed out" fifteen minutes prior to the scheduled beginning of the shift and were performing work prior to the scheduled beginning of their shifts, including being "dressing out" and ready to perform work at least fifteen minutes before the scheduled beginning of their shifts.

38.     Defendants have numerous cameras in the above-ground section of each of the mines that capture and store video images of employees arriving at each mine prior to the scheduled beginning of their shift and performing work or, at the very least, being present and prepared to perform work at Defendants' request, at least fifteen minutes before the scheduled beginning of their shifts.

39.     Upon information and belief, the video footage is of sufficient quality to allow the viewer to recognize individual employees and determine when each individual employee arrived and began performing work for Defendants.

40.     Defendants should preserve, without modification or alteration, all video footage in their possession that shows coal mine workers at the Excel Mine / MC Mining Complex arriving to perform work and/or dressed and ready prior to the scheduled beginning of their shifts, so that the jury has the opportunity to confirm the truth and accuracy of the allegations in this Complaint.

41.     In addition to being actually aware, through its management on site at the mines, that workers were required to (and did, in fact) arrive early and worked without pay at least fifteen minutes prior to their scheduled shifts, Excel and MC Mining had sophisticated technology installed by a separate subsidiary of the Parent Defendants, Matrix Design Group, LLC, which provided detailed information to Defendants about the times that each employee reported to work prior to the scheduled beginning of their shifts and performed work off the clock.

42.     Specifically, "tracker" devices capable of following and recording the exact location of each miner are attached to each miner's helmet and are required to be worn by the miner at all times in the workplace.

10

43.     The tracking system does not merely record the current location of each miner's tracker device, but also records and preserves in Defendants' data systems the exact time each miner moves to a new location.

44.     Prior to the beginning of every shift, the tracker device and the tracking system installed at Excel's and MC Mining's facilities automatically recorded the fact of the helmet beginning to move when the tracker device would register with a different receiver besides the one installed in the "bathhouse" area of each mine's facility.

45.     Therefore, while the tracker device would not necessarily capture the exact time an employee began to perform work if the employee performed work before gathering his or her helmet (or performed donning work, including donning the helmet, before moving the helmet sufficiently to trigger the tracker device to register a change in location), Defendants knew from the tracker data that, at the very latest, each worker should have been paid from the time that the tracker device first showed on a particular day the worker having moved within Defendants' mine facility, including moving out of the bathhouse and being picked up by a different receiver in a different location of Defendants' mine facility.

46.     Further, Defendants instructed workers at the mines to wave their helmet and tracker device under a timeclock-like device for the purpose of registering the fact that they were present.

47.     Although Defendants' system automatically recorded the exact time when Plaintiff and Class Members would wave their tracking devices under the time clock device, Defendants did not utilize that time for the purpose of paying Plaintiff and Class Members.

48.     Rather, Defendants failed to pay any coal mining employees for their time expended in compensable activities prior to the scheduled beginning of the shift; and instead,

Defendants would only pay Plaintiff and Class Members from the time that their shift was scheduled to begin.

### Defendants Do Not Take Into Account Bonus Compensation As Required By Law In Calculating Plaintiff and Class Members' Overtime Rates of Pay

49.     In addition to not paying Plaintiff and Class Members for time that should have been compensated prior to the scheduled beginning of employees' shifts and time spent doffing their protective gear at the end of their shifts, Defendants also failed to pay Plaintiff and Class Members the appropriate overtime rate of compensation for overtime work.

50.     Plaintiff and Class Members were paid several forms of bonus compensation that were not discretionary and which should have been included in their "regular rate" of compensation for determining their overtime rate of compensation.

51.     Specifically, Defendants provided their employees a "*Benefits Handbook*," which described certain bonus compensation to which Plaintiff would be entitled as part of Plaintiff's compensation for his work for Defendants.

52.     The *Benefits Handbook* describes certain bonuses that Plaintiff and Class Members were promised upon hiring, including the following:

**Attendance Incentive Bonus**

An employee achieving attendance benchmarks for working without the incurrence of absences (other than paid vacation, paid personal, paid bereavement leave, safety day, or jury duty or court-ordered appearance) will receive a bonus of fifty dollars ($50.00), which will increase annually but fifty dollars ($50.00) for each subsequent and consecutive year in which subsequent attendance benchmarks are reached, with no maximum limit. The time period for calculating whether an employee qualifies for an attendance incentive bonus shall begin each year on December 1st and end on November 30th of the following year.

The attendance incentive bonus is generally paid during the month of December.

Any break in service to the Company or incurrence of non-paid absence from regularly scheduled work shall result in an employee's attendance incentive bonus

being reset to zero dollars ($0.00). However, temporary shutdowns of your location due to mining conditions or equipment issues beyond employee control shall not be considered a break in service for the purpose of calculating consecutive years of eligibility.

The Company reserves the right to change the qualifications for the Attendance Incentive Bonus at any time, as well as determine the eligibility and qualifying achievement of those who may receive the Attendance Incentive Bonus.

******

**New Electrical Certification Bonus**

For obtaining a State or Federal Electrical Certification, an employee may be eligible for a one-time (for each locally applicable jurisdiction) bonus of five hundred dollars ($500.00), along with reimbursement of limited out-of-pocket expenses approved by the Company. To qualify for this bonus, an employee must not have been paid for time necessary to obtain the certification. Additionally, you must be employed by your (or a participating) employer on the day the bonus is distributed. The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the New Electrical Certification Bonus.

**New Mine Foreman Certification Bonus**

For obtaining a new Mine Foreman Certification, you may be eligible for a New Mine Foreman Certification Bonus of five hundred dollars ($500.00), as well as a reimbursement of limited out-of-pocket expenses. The New Mine Foreman Certification Bonus is offered as a one-time bonus for each state in which an employee obtains Mine Foreman Certification for the first time. Additionally, to be eligible an employee must not have been paid for the time necessary to obtain the certification.  Additionally, you must be employed by your (or a participating) employer on the day the bonus is distributed. The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the new Mine Foreman Certification Bonus.

**Emergency Medical Technician (EMT) Certification Bonus**

For obtaining an Emergency Medical Technician (EMT) certification, an employee is eligible to receive an Emergency Medical Technician Bonus of one thousand dollars ($1,000.00), as well as reimbursement of limited out-of-pocket expenses. Additionally, employees certified as an Emergency Medical Technician are eligible to receive one thousand dollar ($1,000.00) bonus annually for so long as the certification remains current and the employee remains an employee of the Company on the day the bonus is distributed. The amount of an Emergency Medical Technician Bonus may be prorated, for a calendar year, if the individual receiving

13

the bonus is certified for less than the full calendar year for which the bonus is being paid. The Emergency Medical Technician Bonus generally will be paid in December.

The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the Emergency Medical Technician Certification Bonus.

**Mine Emergency Technician (MET) Certification Bonus**

For obtaining a Mine Emergency Technician (MET) certification, an employee is eligible to receive a Mine Emergency Technician Bonus of three hundred fifty ($350.00), as well as reimbursement of limited out-of-pocket expenses. Additionally, employees certified as a MET are eligible to receive a three hundred fifty dollar ($350.00) bonus annually for so long as the certification remains current and the employee remains an employee of the Company on the day the bonus is distributed. The amount of a Mine Emergency Technician Bonus may be prorated, for a calendar year, if the individual receiving the bonus is certified for less than the full calendar year for which the bonus is being paid. The Mine Emergency Technician Bonus generally will be paid in December.

The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the Mine Emergency Technician Certification Bonus.

An employee who receives an EMT bonus is not eligible for an MET bonus.

*Benefits Handbook* at 154-56.

53.     Defendants paid these bonuses to Plaintiff and Class Members, but they failed to include such bonuses in the "regular rate" used to calculate the overtime rate of pay for Plaintiff and Class Members.

54.     In addition to the bonuses described above, the *Benefits Handbook* provided that "each full-time employee will receive a bonus equivalent to forty (40) hours of regular pay, which is generally paid in December prior to Christmas. Each full-time hourly employee will receive forty (40) hours multiplied by the employees' regular base rate of pay...for employees less than one year of service, the bonus will be prorated. In order to receive the five days paid bonus, an

14

employee must still be employed by the company the date the bonus is distributed." *Id.* at 154-155.

55.     Further, the *Benefits Handbook* promised Plaintiff and Class Members that "the seniority days bonus is paid to full time employees every December, starting their sixth year of service. The amount of the bonus is based on an accrual of seniority days at a rate of one day for each year after five years of service. For hourly employees, the bonuses equal to eight hours multiplied by the employees' regular based rate for each seniority day they have accrued…for all eligible employees the maximum number of seniority days accrual is the greater of one twenty days or two seniority days that you accrued and were paid in 2016. To be eligible you must be employed with a participating employer on the day the bonus is distributed…to be eligible for seniority days bonus you must be employed with your employer on the day the bonus is distributed." *Benefits Handbook* at 155.

56.     The Seniority Days Bonus and the Five Days Bonus should have been included in calculating employees' overtime rates of pay. In addition to not qualifying for exclusion from the regular rate as discretionary bonuses under 29 U.S.C. § 207(e)(1), the bonuses were not "paid as gifts" or "payments in the nature of gifts made at Christmastime or on other special occasions," and, therefore, were not excludible from the "regular rate" under 26 U.S.C. § 207(e)(1).

57.     Indeed, under Kentucky law, the employees had a legal right to the payment of the portion of such bonuses accrued prior to such time as the employer informed the employees that the employer was prospectively terminating the bonus plan (which Defendants never did).

58.     Specifically, while the *Benefits Handbook* provided that "the company reserves the right to amend or terminate any benefit plan at any time and for any reason without the consent of any employer or other party," (*id*. at 2), and also provided that, with respect to "Special Benefits,"

the company's "policies, procedures, and rules are subject to change at any time" and that "management reserves the right to modify any benefit at any time," (*id*. at 147), the *Benefits Handbook* was merely was reserving the right for management to prospectively amend or terminate the benefits described therein, rather than retroactively terminating such benefits.

59.     Moreover, the *Benefits Handbook* did not disclaim that a contract was being created thereunder under which employees could expect to be able to accrue benefits as described in the *Benefits Handbook* unless and until such time as management informed the employees that it was prospectively terminating those benefits. Therefore, these payments were not in the nature of a gift.

60.     By way of example, if Defendants were to announce in December of a given year – after coal mine employees had worked all year under the understanding that they would receive the Five-Day Pay Bonus and Seniority Days Bonus – that Defendants did not intend to honor or pay those Bonuses because they were retroactively "terminating" such bonuses, these employees would be entitled to sue for and recover the Bonuses they had already earned. Thus, these bonuses should have been included in calculating overtime rates of pay.

61.     Defendants did not include these bonuses in calculating the overtime rate of pay for Plaintiff and Class Members and Defendants failed to pay Plaintiff and Class Members 1.5 times the employees' hourly rate of pay as the overtime rate of compensation.

62.     Had the Defendants appropriately included the bonus compensation in the Plaintiffs' and Class Members' "regular rate" of pay for purposes of calculating the employees' overtime rate of pay, Plaintiff and Class Members would have received substantially higher rates of pay.

63.     Defendants should be ordered to pay the overtime compensation which they should have paid, but did not pay because they used an erroneous, lower-than-legally-required overtime rate of compensation.

**Each Parent Defendant and Each Subsidiary Defendant are
Joint Employers of Plaintiff and Class Members**

64.     Defendants have utilized a complex and convoluted organizational structure with separate corporate entities and partnerships serving variously as holding companies, management companies, and operating companies in an attempt to shield themselves from wage and hour liability, while, in fact, they are the joint employers of Plaintiff and Class Members.

65.     This web of subsidiaries allows the Parent Defendants to maintain operational control over the day-to-day functions of Plaintiff and Class Members.

66.     The Parent Defendants are joint employers under the FLSA. *See* 29 C.F.R. § 791.2.

67.     The Parent Defendants control every significant aspect of their subsidiaries coal mining operations.

68.     In particular, the Parent Defendants jointly controlled and directed the employment policies and practices, including the illegal pay practices of their subsidiaries (including Excel and MC Mining), by directing such subsidiaries to follow the uniform time-keeping and pay practices of the Parent Defendants, which the Parents Defendants applied uniformly to all of their subsidiaries and the subsidiaries' employees. Accordingly, each Parent Defendant was a joint employer of the employees of Excel and MC Mining.

69.     Among other things, the Parent Defendants required their subsidiaries, including Excel and MC Mining, to utilize their proprietary time-keeping hardware and software system developed by another ARLP subsidiary, Matrix Design Group, LLC, as the exclusive means for its subsidiaries to record the time worked and to determine the times periods for which these

subsidiaries would pay for work performed by their employees.

70.     According to Defendant ARLP's 2018 Annual Report on Form 10-K, Matrix Design Group, LLC is a wholly owned subsidiary of Alliance Service Inc., which is in turn a wholly owned subsidiary of Alliance Coal, LLC.

71.     Upon information and belief, Subsidiary Defendants were prohibited by the Parent Defendants from utilizing other time-keeping systems, and none of the Subsidiary Defendants used any time-keeping system other than the Matrix system mandated by the Parent Defendants.

72.     Although the Matrix system was the exclusive method Defendants utilized to record the time worked by employees, it did not record all time worked by Excel and MC Mining employees, who were required to don and doff specialized protective equipment off-the-clock, as described above. Plaintiff and Class Members were not permitted to clock in until after performing the time-consuming task of donning their specialized protective equipment, and they were required to clock out before performing the equally time-consuming task of doffing and storing their protective gear.

73.     Defendant ARLP describes its use of Matrix Design Group, LLC's technology across all its subsidiaries' mining operations in its 2018 Annual Report on Form 10-K, stating:

> Our subsidiaries, Matrix Design Group, LLC ("Matrix Design") and its subsidiaries Matrix Design International, LLC and Matrix Design Africa (PTY) LTD, and Alliance Design Group, LLC ("Alliance Design") (collectively the Matrix Design entities and Alliance Design are referred to as the "Matrix Group"), provide a variety of mining technology products and services for our mining operations and certain industrial and mining technology products and services to third parties. Matrix Group's products and services include miner and equipment tracking systems and proximity detection systems. We acquired Matrix Design in September 2006.

74.     The technology provided to the Subsidiary Defendants by the "Matrix Entities" (as described in the 2018 Form 10-K), was required by the Parent Defendants for all ARLP

subsidiaries with coal mining operations, and included a proprietary system that tracked employees via an electronic device attached to each miner's helmet, which allowed Defendants to continuously monitor the movements of each miner both above and below ground.[3] Stated differently, the technology provided by the Matrix Entities to Excel and MC Mining enabled them to track and record the movements of each miner from the moment the miner retrieved his or her helmet from his or her locker until it was returned to the locker.

75.     The Matrix Entities had the capability of utilizing the tracking device to automatically record in the Subsidiary Defendants' payroll system the time when each worker's "tracker" device began moving, so that the Subsidiary Defendants could begin paying the worker from that time (if it was not already paying the worker at that time), but intentionally chose not to have the tracker be so utilized by the Subsidiary Defendants.

76.     Instead, the Matrix Entities provided timeclock-like devices to each Subsidiary Defendant (and all other subsidiaries of the Parent Defendants which operated coal mines) and directed the Subsidiary Defendants to have their respective employees wave the tracker device attached to their helmet under the time clock-like device for the purpose of "clocking in" to register the fact that the employee was present.

77.     Although the Matrix system was capable of and, in fact, did record the exact time when each employee would wave his or her helmet under the timeclock-like device to "clock in." the Parent Defendants instructed the Subsidiary Defendants not to begin paying Plaintiff and Class

---

[3] Use of such tracking systems is required under the Mine Improvement and New Emergency Response Act of 2006, and is described in the *Basic Tutorial on Wireless Communication and Electronic Tracking:  Technology Overview* issued by the Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, which is available at: https://www.cdc.gov/niosh/mining/content/emergencymanagementandresponse/commtracking/commtrackingtutorial1.html.

Members when they "clocked in," but instead they set up their system to automatically begin paying Plaintiff and Class Members at the later scheduled start-of-shift time.

78.     Each Subsidiary Defendant followed the Parent Defendants' directions to install and use the Matrix time-keeping systems, and each Subsidiary Defendant engaged in the uniform practice of paying Plaintiff and Class Members only from the scheduled start-of-shift time, despite the fact that the Matrix technology regularly recorded workers performing work prior to that time.

79.     Parent Defendants and Subsidiary Defendants are joint employers as: 1) each Subsidiary Defendant installed the same tracking system and time-keeping system provided by the Matrix Entities; 2) each Subsidiary Defendant chose, in the same way, to willfully ignore the data generated by that system regarding work performed prior to the scheduled beginning of shifts and instead pay workers only from the scheduled beginning of the shifts; 3) the data available to each Subsidiary Defendant were also available to Parents Defendants.

80.     Specifically, the time-keeping system installed by the Matrix Entities with each of the Subsidiary Defendants to record the amount of time that the Subsidiary Defendants chose to pay the workers was recorded in a centralized system containing information for each of the Subsidiary Defendants in one location, under the control of the Parent Defendants.

81.     Using the Parent Defendants' centralized Matrix system, management at a mine operated by one subsidiary could access the time-keeping records of other subsidiaries. For example, management at the Dotiki Mine operated by Alliance subsidiary, Webster County Coal, LLC, was able through the centralized database to access information regarding Class Members who worked for Hamilton County Coal, LLC, another Alliance subsidiary that runs mining operations in Illinois, even though Class Members of Hamilton County Coal, LLC did not work at the Dotiki mine.

82.     Upon information and belief, management at the Excel mine could similarly access the time-keeping and payroll records of Class Members of other Alliance Coal, LLC subsidiaries, and management at other Alliance Coal, LLC subsidiaries could similarly access the records of Excel Mining, LLC and MC Mining, LLC Class Members.

83.     Further, each Parent Defendant directed each Subsidiary Defendant to tell Class Members that the Class Members could retrieve information regarding his or her pay through a centralized "employee portal" on a website maintained by Defendant ARLP, and each Subsidiary Defendant complied with these directions.

84.     Specifically, Defendant ARLP's website (www.arlp.com) links to a centralized "Employee Portal" for all persons employed by Defendants (available at: https://www.coalbenefits.com/), which directs Class Members to another website maintained by Defendant ARLP within the www.arlp.com domain, which provides links for "Human Resources," "Payroll" and "Raymond D. Wells, PSC."

85.     Persons selecting the link on the Employee Portal website for "Payroll" are directed to an UltiPro website, which provides centralized payroll services (such as direct deposits and electronic "paystubs") for each the Subsidiary Defendants pursuant to the Parent Defendants' contractual relationships with Ultimate Software (the makers of the UltiPro Software). In the alternative, each Parent Defendants directs each of the Subsidiary Defendants to contract with Ultimate Software to provide services directly to such Subsidiary Defendants and, as directed, each of the Subsidiary Defendants does so contract with Ultimate Software.

86.     In performing its payroll services, Ultimate Software uses time-keeping data generated by Defendants' Matrix system, which is used by each Subsidiary Defendant.

87.     Indeed, all payroll services are provided by the Parent Defendants utilizing the

information regarding the amount of time with which each Subsidiary Defendant Class Member should be credited with having worked generated by the proprietary tracking and time-keeping system developed and installed by the Matrix entities, and was processed in the same manner for Class Members of each of the Subsidiary Defendants.

88.     Persons selecting the link on the Employee Portal for "Human Resources" are directed to a common website for all employees of the Subsidiary Defendants, as well as all employees of other subsidiaries of the Parent Defendants.

89.     Persons selecting the link on the employee portal for "Raymond D. Wells P.S.C." are directed to a website of a medical practice that serves employees of the Subsidiary Defendants and employees of numerous other subsidiaries of the Parent Defendants. On the "About Us" page (available at: https://wellspsc.com/home/about-us/), it states: "Raymond D. Wells PSC is the exclusive provider of on-site medical services to all Alliance Coal employees," and lists "locations" for the provider, including Excel.

90.     In addition to maintaining identical payroll practices using proprietary time-keeping technology developed by related entity Matrix, and maintaining universal employee information databases, the Parent Defendants' control over the Subsidiary Defendants' employee pay practices is also shown by the Subsidiary Defendants' use of identical documents to notify employees about employment policies.

91.     Specifically, each Subsidiary Defendant uses virtually identical employee handbooks. And instead of attempting to create documents specific to a particular subsidiary, the Subsidiary Defendants often provided their employees' documents containing policies of the Parent Defendants, rather than the particular subsidiary.

92.     Each Parent Defendant exercises and/or retains the authority to hire and fire

22

employees of each Subsidiary Defendant and to otherwise perform Human Resource functions (including discipline), and forces such Subsidiary to acknowledge such authority, even if it is not exercised by a particular Parent Defendant with respect to a particular Subsidiary Defendant.

93.    Defendant ARLP described itself and its subsidiaries, including Defendant Alliance Coal, LLC and the Subsidiary Defendants, as being part of the same company for purposes of their annual report and described transactions amongst the Defendants as "intercompany transactions."

94.    Specifically, Defendant ARLP specifically refers to employees of the Subsidiary Defendants as its employees and to the operations of the Subsidiary Defendants as its own operations. *See* ARLP Form 10-K at 9 ("as of December 31, 2018, we had 2,331 employees, and we operate five active mining complexes in Illinois Basin") and 31 ("to conduct our operations, as of December 31, 2018, we employed 3,599 full time employees, including 3,212 employees involved in active mining operations…").[4]

95.    In addition to referring the employees of the Subsidiary Defendants' as its own employees, Defendant ARLP has referred to the mining operations of its subsidiaries as its own mining operations in publicly released press statements. *See*, *e.g.*, Press Release, ARLP, (Jan. 13,

---

[4]    Defendant ARLP's 2018 Annual Report on Form 10-K, at 84-86, defines "ARLP Partnership" as Alliance Resource Partners, L.P., the parent company, as well as its consolidated subsidiaries, which include Alliance Coal; Alliance Design Group, LLC; AHGP; Alliance Land, LLC; Alliance Minerals, LLC; Alliance Resource Properties; Alliance Resource Finance Corporation; AllDale Minerals, LP, AllDale Minerals II, LP; Alliance Royalty, LLC; AllRoy GP, LLC; ARM GP Holdings, Inc.; AROP Funding, LLC; ARP Sebree, LLC; ARP Sebree South, LLC; Alliance WOR Properties, LLC; Alliance Service, Inc.; Backbone Mountain, LLC; Cavalier Minerals JV, LLC; CavMM, LLC; CR Services, LLC; CR Machine Shop, LLC; Gibson County Coal, LLC; Hamilton County Coal, LLC; Hopkins County Coal, LLC; Matrix Design Group, LLC; Matrix Design International, LLC; Matrix Design Africa (PTY) LTD; MC Mining, LLC; Mettiki Coal, LLC; Mettiki Coal (WV), LLC; Mid-America Carbonates, LLC; MGP II, LLC; Mt. Vernon Transfer Terminal, LLC; New AHGP GP, LLC; Penn Ridge Coal, LLC; Pontiki Coal, LLC; River View Coal, LLC; Rough Creek Mining, LLC; Sebree Mining, LLC; Steamport, LLC; Tunnel Ridge, LLC; UC Coal, LLC; UC Mining, LLC; UC Processing, LLC; Warrior Coal, LLC; Webster County Coal, LLC; White County Coal, LLC; WOR Land 6, LLC; and Wildcat Insurance, LLC.

2020) ("ARLP currently produces coal from seven mining complexes it operates in Illinois, Indiana, Kentucky, Maryland and West Virginia.").

96.     In addition to exercising authority to hire, fire, discipline, and otherwise exercise payroll, scheduling and human-resources-related control over Class Members of the Subsidiary Defendants, the Parent Defendants also exercised control over the pay rates and insurance benefits provided by the Subsidiary Defendants to their nominal employees.

97.     In addition, the Parent Defendants supervised the actual work performed by the nominal employees of the Subsidiary Defendants. For instance, the Subsidiary Defendants would receive directions from the Parent Defendants regarding how its workers should perform mining operations and in what direction workers should mine for coal, etc.

98.     To be clear, upon information and belief, Plaintiff allege that the Parent Defendants expressly supervise and control the Subsidiary Defendants' requirement that Plaintiff and Class Members must come to work early and be "dressed and ready" fifteen minutes prior to the scheduled shift beginning and that the Subsidiary Defendants not pay Plaintiff or Class Members for this work but instead only pay Plaintiff and Class Members from the time of the scheduled beginning of their shift.

99.     The Parent Defendants further direct, supervise and control that the Subsidiary Defendants' pay to Plaintiff and Class Members not include in the calculation of the overtime rate of pay any amount on account of bonuses paid.

100.    The Parent Defendants direct, supervise and control the Subsidiary Defendants' violations of the FLSA and the KWHA alleged herein with respect to Plaintiff and Class Members.

101.    Further, despite the employees being nominal employees of the Subsidiary Defendants, the Parent Defendants maintain the employment records for Plaintiff and Class

Members, including: (a) payroll records showing amounts worked, (c) the "second set of books" regarding the amount of time worked: the "tracker" data showing when employees were present and performing work, but not being paid, and (d) time records showing times employees were actually credited by Defendants.

102.    Upon information and belief, the Parent Defendants share common management among themselves and with the Subsidiary Defendants, and management of the Subsidiary Defendants is told that such positions are considered a steppingstone to more-desirable and higher-paying positions in the Parent Defendant entities. Accordingly, management of the Subsidiary Defendants is closely aligned with the management of the Parent Defendants.

103.    Indeed, the Parent Defendants act directly and indirectly in the interest of an employer in relation to the employees of the Subsidiary Defendants, including the Plaintiff and Class Members, receiving all of the benefit of the work of the employees despite the work being nominally entitled as having been performed for a particular Subsidiary Defendant.

104.    Notably, the Parent Defendants are aware that Class Members of each Subsidiary Defendant are economically dependent upon the Parent Defendants because if any Class Member fails to comply with the Subsidiary Defendant's rule (as dictated by the Parent Defendants) that Class Members report to work so as to be "dressed and ready" at least fifteen minutes prior to their scheduled shift, and instead arrives and begins performing donning work at the scheduled beginning of their shifts, miners will not be able to "drop in" to mines on the schedule the Parent Defendants insist the Subsidiary Defendants follow.

105.    Delaying "drop in" delays production and is viewed by Defendants as a serious offense that may be the basis for termination of a Class Member.

106.    Since Class Members terminated by any of the Subsidiary Defendants would not

be eligible for rehire by any of the Subsidiary Defendants pursuant to the Parent Defendants' prohibitions barring Subsidiary Defendants from hiring individuals terminated by another Subsidiary Defendant. Because the Parent Defendants' subsidiaries mines represent, in aggregate, a large proportion of the available coal mining, the Parent Defendants are, by means of their control of the Subsidiary Defendants, able to engage in the violations of the FLSA and KWHA, as alleged herein, without fear of repercussions.

107.    The Parent Defendants' directions to the Subsidiary Defendants to engage in the FLSA and KWHA violations, described herein, were not mere suggestions or recommendations, but rather were mandatory instructions with which the Subsidiary Defendants were required to comply.

108.    Stated another way, the decision of the Subsidiary Defendants to engage in the practices of requiring employees to come in and be "dressed and ready" prior to the scheduled beginning of their shift and to not pay appropriate overtime compensation based on bonus compensation provided and to otherwise to engage in the violations described above, was not discretionary on the part of the Subsidiary Defendants.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

109.    Plaintiff brings this action under the FLSA on behalf of himself and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their overtime work which Defendants should have paid within the last three years, as defined in paragraph 24.

110.    Plaintiff desires to pursue his FLSA claim on behalf of any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

111.    Plaintiff and the FLSA Collective are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, inter alia, all such individuals worked pursuant to Defendants'

previously described common pay practices and, as a result of such practices, were not paid the full and legally mandated overtime premium for hours worked over forty (40) during the workweek. Resolution of this action requires inquiry into common facts, including, inter alia, Defendants' common compensation, time-keeping and payroll practices.

112.    Specifically, the employment policies, practices and agreements of Defendants raise questions of fact common to the proposed collective group including:

a.  whether Defendant has engaged in a pattern or practice of permitting or requiring Plaintiff and members of the proposed collective to work in excess of forty hours per workweek for the benefit of Defendants and without appropriate compensation, in violation of the FLSA;

b.  whether Defendants have engaged in a pattern or practice of failing to keep accurate records showing all hours worked by Plaintiff and members of the proposed collective, in violation of the FLSA;

c.  whether the conduct of Defendants was willful; and

d.  whether Plaintiff and members of the proposed collective group are entitled to lost wages, liquidated damages and the other relief requested.

113.    Plaintiff's claims are similar to those of the FLSA Collective in that Plaintiff has been subject to the same conduct as FLSA Collective Members and Plaintiff's claims are based on the same legal theory as FLSA Collective Members.

114.    The similarly situated employees are known to Defendants and are readily identifiable and may be located through Defendants' business records and the records of any payroll companies Defendants use.

115.    Plaintiff's FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

116.    Defendants employ many FLSA Collective Members throughout the United States. These similarly situated employees may be readily notified of the instant litigation through direct means, such U.S. mail and/or other appropriate means, and should be allowed to opt into it pursuant

to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their similar claims for overtime and other compensation violations, liquidated damages, interest, and attorneys' fees and costs under the FLSA.

## CLASS ACTION ALLEGATIONS PURSUANT TO FED. R. CIV. P. 23 FOR DEFENDANTS' VIOLATIONS OF THE KWHA

117.    Plaintiff brings this action under the KWHA on behalf of himself and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their overtime work for which for Defendants which Defendants should have paid within the last five years, as defined in paragraph 25.

118.    Plaintiff is a member of the class he seeks to represent.

119.    Defendants failed to pay Plaintiff and the members of the class he seeks to represent wages for work performed, as described herein, in violation of the KWHA.

120.    Under the KWHA, employers are required to compensate employees for all of the time that employees spend working, and for all overtime compensation earned by such employees.

121.    Accordingly, Defendants' refusal to pay Plaintiff and Class Members for all of the hours that Plaintiff actually worked and Defendants' refusal to pay the full overtime compensation earned by Plaintiff and Class Members violated the KWHA.

122.    The Rule 23 Class is sufficiently numerous that joinder of all members is impractical, satisfying Fed. R. Civ. P. 23(a)(1). Defendants have employed hundreds, if not thousands, of individuals in Kentucky who were subject to Defendants' illegal policies and practices described herein.

123.    All members of the Rule 23 Class share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2). Namely, all members of the Rule 23

Class share common questions, including: (1) whether Defendants paid them for all time worked; and (2) whether Defendants' failed to pay them the full amount of overtime compensation earned.

124.    Plaintiff's claims are typical of the claims of the Rule 23 Class, thus satisfying Fed. R. Civ. P. 23(a)(3) typicality. Defendants' failure to pay Plaintiff for all hours worked was not the result of any circumstances specific to the Plaintiff.  Rather, it arose from Defendants' common pay policies, which Defendants applied generally to their employees.

125.    Plaintiff will fairly and adequately represent and protect the interests of the Rule 23 Class.

126.    Plaintiff has retained competent counsel experienced in representing classes of employees in lawsuits against their employers alleging failure to pay statutorily required overtime compensation, thus satisfying Fed. R. Civ. P. 23(a)(4).

127.    By failing to pay Plaintiff and Class Members for all hours worked, and failing to pay employees the full amount of overtime compensation earned, Defendants have created the circumstance under which questions of law and fact common to the Rule 23 Class members predominate over any questions affecting only individual members. Thus, a class action is superior to other available methods for fair and efficient adjudication of this matter. Accordingly, Plaintiff should be permitted to pursue the claims alleged herein as a class action, pursuant to Fed. R. Civ. P. 23(b)(3).

## COUNT I

## VIOLATION OF FLSA
## NONPAYMENT OF OVERTIME COMPENSATION

128.    Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

129.    Defendant is subject to the wage requirements of the FLSA because Defendant is an "employer" under 29 U.S.C. § 203(d).

130.    During all relevant times, the members of FLSA Collective, including Plaintiff, were covered employees entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

131.    The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1½) times the regular rate at which he is employed.  See 29 U.S.C. § 207(a)(1).

132.    Plaintiff and the FLSA Collective are not exempt from the requirements of the FLSA.  Plaintiff and the FLSA Collective are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek pursuant to 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

133.    Defendants' compensation scheme applicable to Plaintiff and the FLSA Collective failed to comply with either 29 U.S.C. § 207(a)(1) or 29 C.F.R. § 778.112.

134.    Defendants knowingly failed to compensate Plaintiff and the FLSA Collective at a rate of one and one-half (1½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 778.112.

135.    The FLSA also requires that bonus compensation promised to an employee for working for a particular period of time must be included in determining the "regular rate" of compensation for an employee, which in turn is the basis for determining the appropriate rate of overtime compensation for work in excess of forty (40) hours in a week.  *See* 29 U.S.C. § 207(e); 29 C.F.R. § 778.208.

136.    Specifically, 29 U.S.C. § 207(a) prohibits employment of non-exempt employees

beyond forty (40) hours in a work week "unless such an employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

137.   For purpose of calculating overtime compensation, 29 U.S.C. § 207(e) provides that "the 'regular rate' at which an employee is employed shall be deemed to include ***all remuneration*** for employment paid to, or on behalf of, the employee." (Emphasis added.)

138.   None of the bonuses paid by Defendants would qualify as a discretionary bonus under 29 U.S.C. § 207(e)(3) and 29 C.F.R. § 778.211. A bonus is eligible for exclusion from the regular rate only if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3).

139.   Indeed, 29 C.F.R. § 778.211(c) expressly states: "***Promised bonuses not excluded****.* The bonus, to be excluded under section 7(e)(3)(a), must not be paid 'pursuant to any prior contract, agreement, or promise.' For example, any bonus which is promised to employees upon hiring or which is the result of collective bargaining would not be excluded from the regular rate under this provision of the Act." (Emphasis added.)

140.   Defendants have willfully violated the FLSA by engaging in a pattern or practice (or patterns or practices) of:

     a.   failing to keep accurate records showing all the time it permitted and/or required Plaintiff and members of the proposed collective to work, from the first compensable act to the last compensable act, which has resulted in the denial of compensation at an overtime rate as required by the FLSA, for all time worked, and for all time worked in excess of forty hours in a work week;

     b.   permitting and/or requiring Plaintiff and FLSA Collective to perform integral and indispensable activities (*i.e.*, work) in excess of forty hours in a work week,

for the benefit of Defendants and without compensation at the applicable federal overtime rates; and

c.   failing to pay employees the full amount of overtime compensation earned.

141.   Pursuant to 29 U.S.C. § 216(b), employers, such as Defendants, who fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for the unpaid minimum and overtime wages, an additional equal amount as liquidated damages, reasonable attorney's fees, and costs of the action.

## COUNT II

**VIOLATION OF KY. REV. STAT. ANN. §§ 337.275, *ET SEQ*.
BY NONPAYMENT OF WAGES.**

142.   All previous paragraphs are incorporated as though fully set forth herein.

143.   Plaintiff bring this claim on behalf of all members of the proposed Rule 23 Class.

144.   Kentucky state law requires that covered employees be compensated for every hour worked in a workweek. *See* KY. REV. STAT. ANN. §§ 337.275, *et seq*.

145.   KY. REV. STAT. ANN. § 337.285 requires that employees receive overtime compensation "not less than one and one-half (1-1/2) times" the employee's regular rate of pay for all hours worked over forty in one workweek. *See also* 803 Ky. Admin. Regs. 1:060.

146.   During all times material to this complaint, Defendants were each a covered employer required to comply with KY. REV. STAT. ANN. § 337.010(1)(d).

147.   During all times material to this complaint Plaintiff and the Rule 23 Class were covered employees entitled to the protections of the KWHA. *See* KY. REV. STAT. ANN. § 337.010(1)(e).

148.     Plaintiff and Class Members are not exempt from receiving the KWHA's overtime benefits because they do not fall within any of the exemptions set forth therein. *See* KY. REV. STAT. ANN. § 337.285(2).

149.     Defendants have violated the KWHA with respect to Plaintiff and the Rule 23 Class by, *inter alia*, failing to compensate them for all hours worked at their normal hourly rate (for time worked under forty hours per week) and at one and one-half their "regular rate" for all hours worked in a workweek in excess of forty hours.

150.     In violating the KWHA, Defendants acted willfully and with reckless disregard of clearly applicable provisions of the KWHA.

151.     Pursuant to KY. REV. STAT. ANN. § 337.385, Defendants, because they failed to pay employees the required amount of wages and overtime at the statutory rate, must reimburse the employees not only for the unpaid wages, but also for liquidated damages in an amount equal to the amount of unpaid wages.

152.     Pursuant to KY. REV. STAT. ANN. § 337.385, Plaintiff and Class Members are entitled to reimbursement of the litigation costs and attorney's fees expended if they are successful in prosecuting an action for unpaid wages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays that the Court:

A.     Issue process and bring Defendants before the Court;

B.     Enter an order permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. §216(b);

       C.      Authorize prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Collective Members;

       D.      Enter an order permitting this litigation to proceed as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the Kentucky Class;

       E.      Grant Plaintiff and the Classes a judgment for backpay including compensation for unpaid work time, compensation for unpaid overtime pay, interest, and liquidated or exemplary damages, in amounts to be proven at trial;

       F.      Award Plaintiffs and the Classes Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law;

       G.      Grant Plaintiff and/or the Classes such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims and issues for which Plaintiff and the Classes are entitled to a jury.

Respectfully submitted,

March 27, 2020

Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com

Sarah R. Schalman-Bergen*
Eric Lechtzin*
Camille Fundora Rodriguez*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
sschalman-bergen@bm.net
elechtzin@bm.net
crodriguez@bm.net

/s/ John R. Kleinschmidt, III
John R. Kleinschmidt, III
THE LAW OFFICES OF JOHN R.
KLEINSCHMIDT III, PLLC
P.O. Box 1746
Lexington, KY 40588
(859) 866-3097
john@employmentlawky.com

*Motions for *Pro Hac Vice* Admission to Be Filed

*Attorneys for Plaintiff and the Proposed Classes*